IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

DONNIE ARRINGTON,        }
                         }
     Plaintiff,       }
                         }    CIVIL ACTION NO.
v.                  }    04-AR-2274-M
                         }
CHASE JENKINS, et al.,   }
                         }
     Defendants.      }

**MEMORANDUM OPINION**

Before the court is the motion for summary judgment of defendants, City of Rainbow City, Alabama ("Rainbow City"), Chase Jenkins ("Jenkins"), and Morris Alexander ("Alexander").[1] Plaintiff, Donnie Arrington ("Arrington"), presents common law tort claims and claims the violations of various of his constitutional rights.  The complaint contains six counts.  The first five counts are only aimed at Jenkins, who was a police officer for Rainbow City at the time of the incident complained of.  In those counts Jenkins is charged with:  unreasonable force in violation of 42 U.S.C. § 1983 (Count I); denial of due process in violation of § 1983 (Count II); assault and battery (Count III); false arrest, false imprisonment, and malicious prosecution (Count IV); unlawful taking in violation of § 1983 and conversion (Count V).  The last count is aimed only at Rainbow City and Alexander, who was Rainbow

_____

[1]Plaintiff is suing Jenkins and Alexander in both their individual and official capacities.  Insofar as the suit alleges § 1983 liability against the officers in their official capacities, it is essentially the same as the suit against the city itself, and will be treated as such for purposes of this opinion. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991).

City's police chief.  It invokes § 1983 as a basis for supervisor and municipal liability (Count VI).  Upon consideration of the briefs and evidence submitted by the parties, and for the reasons that follow, the court concludes that defendants' motion for summary judgment is due to be granted in part and denied in part.

*Summary Judgment Facts[2]*

Rainbow City hired Jenkins as a police officer in 2001. Jenkins first applied for a position as a Rainbow City policeman in 1999.  At that time, he was employed as a police officer by the City of Gadsden. At Alexander's direction, Dale Walton ("Walton"), chief investigator of the Rainbow City police department, conducted a background check as a part of the application process.  Walton checked Jenkins' references and called his Gadsden police supervisor.   Walton also spoke about Jenkins with several acquaintances of his on the Gadsden police force.  All persons Walton contacted indicated that they knew of no problems with Jenkins and that he had conducted himself appropriately as an officer in Gadsden.  Walton also checked with the Police Officers Standards and Training Commission regarding Jenkins'

---

[2] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993).  In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

certifications.    Walton  did  not  check  Jenkins'  Gadsden  police
department  personnel  file.    If  he  had,  he  would  have  discovered
that  twenty  different  internal  affairs  cases  had  been  opened  on
Jenkins.[3]

Based  on  his  inquiries,  Walton  reported  to  Alexander  that  he
had  found  no  reason  Jenkins  that  should  not  be  hired  as  an  officer
by  Rainbow  City.    Jenkins  thereupon  received  an  offer,  but  for
personal  reasons  declined  to  accept  a  position.    Then,  sometime  in
2000,  he  reapplied.    Walton  conducted  a  follow-up  background
inquiry  to  discover  if  there  were  any  changes  or  updates  to  the
positive  reports  he  had  received  previously.    During  this  follow-
up,  Walton  became  aware  that  Jenkins  had  been  involved  in  an
incident  where  he  had  allegedly  used  excessive  force  while  making
an  unlawful  arrest.    He  allegedly  had  battered  a  minor  arrestee  and
pepper  sprayed  his  mother.[4]    Walton  inquired  about  the  matter  with

_____

[3] Because Arrington provides no evidence regarding the substance of any of
the Gadsden internal affairs cases, they are of limited value in determining what
Rainbow City knew or should have known about Jenkins when it hired him.

[4] According to Walton's affidavit, during this inquiry he became aware that
Jenkins was a defendant in an ongoing federal lawsuit in this court:
     "I at some point became aware...that Officer Jenkins had been named
     a defendant in a lawsuit brought against him and the City of Gadsden
     as a result of his entering a house on police business."
Walton Aff. ¶ 3.
The trouble with this revelation is, the lawsuit to which Walton is apparently
referring, *Daniels v. City of Gadsden*, *et al.*, CV-02-AR-886-M, was not filed
until 2002, as indicated by its civil action number.  Walton's admission that he
was aware in 2000 of something that did not occur until 2002 raises a substantial
question as to what information defendants knew when the decision was made to
hire Jenkins. Because the defendants submitted and relied upon this facially
suspect affidavit testimony, and because the court must view the evidence in the
light most favorable to Arrington, for summary judgment purposes the court will
construe Walton's admission as evidence that he knew of the events underlying the
complaint in *Daniels*.  Therefore, in essence, the summary judgment fact is that

a Gadsden police department supervisor who informed him that Gadsden's department did not believe the allegations and had taken no disciplinary action against Jenkins related to the incident. Satisfied with this opinion, Walton made no effort to learn more about the incident himself.   By affidavit, Walton offers his own commentary that, based on his thirty years in law enforcement, the "mere fact" that Jenkins had been accused (of stabbing someone he was arresting and pepper spraying his mother) did not lead him to conclude that Jenkins would make a sub-standard officer for Rainbow City.

Alexander, as police chief, had *de facto* final authority with regard to hiring police officers.   Though the mayor and city council have ultimate authority over officer hiring decisions, Alexander agreed in his deposition with the statement that the mayor "pretty much lets [him] pick" the officers he believes are best for the job. Alexander Depo. p. 13-14, Def. Ex. 2. Relying on Walton's background inquiry, Alexander decided to hire Jenkins as a Rainbow City officer.   Jenkins began his employment with Rainbow City in January 2001.   Over the next two years, up until the time of Jenkins' encounter with Arrington, there were no citizen complaints about his conduct as a Rainbow City officer,

---

Walton – and through him Chief Alexander and Rainbow City – knew that Jenkins had been accused of using excessive force in April 2000, including allegations that he stabbed a young man and pepper sprayed his mother during an unlawful arrest.

other than from an occasional disgruntled traffic citation recipient.

On the night of July 13, 2003, Arrington went to the home of his stepdaughter in Gadsden, Alabama.  When he arrived, he walked into the middle of an ongoing police search.  The police secured and searched Arrington, held him long enough to determine whether any warrants were outstanding for him, then released him and instructed him to leave the premises.  He did as he was told.

Shortly thereafter, accompanied by his wife, Arrington returned to the scene with a camera.  He parked his vehicle across the street from the house, and proceeded to take pictures of the ongoing search from across the street.  At no time did Arrington re-enter the premises being searched by police.  The camera's flash was visible from across the street, and the officers inside the search premises became aware of Arrington's presence and that he was taking pictures.[5]  A group of officers, including Jenkins, emerged from the house and proceeded to cross the street toward Arrington.  Jenkins' gun was drawn and he and other officers told Arrington to show his hands, which he did.

---

[5]There are substantial factual disputes regarding what took place leading up to and including Arrington's arrest.  For example, Jenkins and other officers testify that they believed Arrington was across the street pointing a gun with a laser sight on it at a police officer.  Arrington, on the other hand, proffers testimony that the officers knew he was taking pictures and told him he should not be taking pictures.  Not surprisingly, Jenkins' and Arrington's versions of events surrounding the physical arrest of Arrington are also markedly different.  In keeping with the summary judgment standard, this recitation of facts reflects Arrington's version of events as supported by the evidence.

Jenkins demanded that Arrington get on his knees.  While Arrington was kneeling, Jenkins and another officer took him to the ground by force.  Jenkins handcuffed Arrington, kicked him, and placed his foot on the back of his neck.  Jenkins proceeded to drag Arrington across the driveway and yard.  The officers arrested Arrington and charged him with public intoxication, disorderly conduct, interference with a government operation, and resisting arrest.  He was subsequently acquitted on all counts.

Arrington suffered injuries that required medical attention at a local hospital.  The next day, when Arrington went to retrieve his camera, he found it in his stepdaughter's house.  The film was missing, and the camera no longer worked.  On July 10, 2003, three days before this incident took place, a jury returned a verdict against Jenkins and the City of Gadsden in the *Daniels* case, over which this court presided, awarding over $300,000 in damages. Arrington has presented no evidence that Alexander, as the personnel decision maker for Rainbow City, was actually aware of the *Daniels* jury verdict prior to the incident involving Arrington and Jenkins.  The Rainbow City police department took no action to restrict Jenkins' duties following the *Daniels* verdict, nor did it investigate the allegations underlying the verdict, which was subsequently challenged on appeal.

*Analysis*

From defendants' present motion, it is not entirely clear whether summary judgment is sought as to all or just some of Arrington's claims.  What is clear, however, is that defendants have only endeavored to demonstrate the absence of a genuine issue of material fact as to the § 1983 municipal liability claims, the claims against Alexander in his individual capacity, and the state law and Fifth Amendment takings claims against Jenkins.  As to Arrington's other claims, defendants have not come close to satisfying the initial burden of demonstrating an absence of fact issues so as to be entitled to judgment as a matter of law.[6]  *See Celotex Corp.*, 477 U.S. at 323 (stating that the movant bears the "initial responsibility of informing the district court of the basis for its motion").  The court will address defendants' properly supported summary judgment arguments in turn.

Municipal Liability

A fair characterization of Arrington's theory of § 1983 municipal liability is that Rainbow City, acting through Alexander, inadequately screened Jenkins and hired and retained him in conscious disregard of the risk that he would use excessive force. In his brief, Arrington clarifies his theory of liability against Rainbow City and Alexander as follows:

---

[6]It is particularly noteworthy that Jenkins has not raised the defense of qualified immunity to the § 1983 claims against him.

7

"The Complaint in this case seeks to impose liability on Morris Alexander and Rainbow City for all of the wrongful acts of Chase Jenkins solely on the basis of hiring and retention decisions that rose to the level of 'official policy.'"

Pl. Brief p. 5.

Given this gloss on the allegations of the complaint, it is clear that Arrington stakes his claim against Rainbow City on the alleged culpability and causal effect of its decisions to hire Jenkins and to keep him on duty after a jury had returned a verdict against him in the *Daniels* case. Upon careful review of the controlling case law, and viewing the record in the light most favorable to Arrington, the court determines that Arrington's theory is not justified by the facts and that defendants' motion for summary judgment is due to be granted as to the municipal liability claim.

The applicable legal principles governing § 1983 municipal liability are not in dispute.[7] It is well settled that there is no *respondeat superior* liability under § 1983 – a municipality is not liable for a deprivation of federally protected right solely because it employs a tortfeasor. *Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388

---

[7]    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

(1997)(*citing Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018 (1978)). Instead, a plaintiff must identify a municipal "policy" or "custom" that caused his injury in order to ensure that the municipality is only held liable for those deprivations resulting from decisions of those officials whose acts may fairly be said to be those of the municipality. *Brown*, 520 U.S. at 403-4, 117 S.Ct. at 1388. Where, as in this case, "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id.* at 405, 117 S.Ct. at 1389. The requisite rigorous standards translate to a requirement that the plaintiff "demonstrate that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences." *Id.* at 407, 117 S.Ct. at 1390.

Within the narrow municipal liability framework of *Brown*, the question is whether Arrington has presented sufficient evidence of deliberate indifference to support a jury verdict against Rainbow City. In *Brown*, the Supreme Court endeavored to clarify when an inadequate screening of a prospective police officer can support a claim of municipal liability for that officer's subsequent constitutional torts. *See id.* at 402, 117 S.Ct. at 1387 ("[w]e granted certiorari...to decide whether the county was properly held

liable" based on a single hiring decision).  There, the final municipal policymaker hired his nephew's son as a deputy without closely reviewing his background, a background that included several driving infractions and guilty pleas to misdemeanors including assault and battery, resisting arrest, and public drunkenness.  *Id.* at 401, 117 S.Ct. at 1387.[8]  A citizen against whom the deputy used excessive force during an arrest brought a § 1983 action, the district court entered judgment on a jury verdict against the municipal defendant, and the Fifth Circuit affirmed. The Supreme Court reversed, holding that the district court erred by submitting the municipal liability claim based on inadequate screening to the jury because the evidence was insufficient to support a finding that the particular hiring decision "reflected conscious disregard of an obvious risk  that a use of excessive force would follow."  *Id.* at 415, 117 S.Ct. at 1393.

The reasoning of *Brown* is also instructive:

[T]he risk from a single instance of inadequate screening of an applicant's background is not 'obvious' in the abstract; rather, it depends upon the background of the applicant.

*Id.* at 410, 117 S.Ct. at 1391.

The court must test the link between the risk of the particular constitutional excess alleged and the background of the particular

---

[8]In *Brown*, the defendant stipulated that the sheriff was the policy maker for the department, such that the case presented "no difficult questions" concerning whether the sheriff's hiring decision could fairly be said to represent final municipal policy.  *Brown*, *supra* at 408, 117 S.Ct. at 1390.  In this case, while Rainbow City has not expressly conceded that Alexander was the final authority for it in hiring police officers, Arrington has presented evidence that he was, and defendants do not contest it.

applicant – in this case, the link between Jenkins' background and the risk he would subsequently use excessive force in violation of the Fourth Amendment as a Rainbow City police officer. *See id.* at 412, 117 S.Ct. at 1392 (the required finding of culpability "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff").

The *Brown* Court expressly avoided deciding whether a single instance of inadequate screening could trigger municipal liability. *Id.* at 412, 117 S.Ct. 1392.   Instead, the Court assumed that it could, and went on to apply the standard it announced to the record before it, dismissing the background of the deputy at issue – a background that included assault and battery and resisting arrest convictions – as insufficient to create a jury question:

> The fact that Burns had pleaded guilty to traffic offenses and other misdemeanors may well have made him an extremely poor candidate for reserve duty.  Had Sheriff Moore fully reviewed Burns' record, he might have come to precisely that conclusion.  But unless he would necessarily have reached that decision *because* Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision, Sheriff Moore's inadequate scrutiny of Burns' record cannot constitute 'deliberate indifference' to respondent's federally protected right to be free from a use of excessive force.
>
> * * * * *
>
> [W]hether Sheriff Moore failed to examine Burns' record, partially examined it, or fully examined it, Sheriff Moore's hiring decision could not have been 'deliberately indifferent' unless in light of that record Burns' use of excessive force would have been a plainly obvious consequence of the hiring decision.  Because there was insufficient evidence on which a jury could base a finding that Sheriff Moore's decision to hire Burns reflected a conscious disregard of an obvious risk that a use of excessive force would follow, the District Court

11

erred in submitting respondent's inadequate screening claim to the jury.

*Id.* at 414-15, 117 S.Ct. at 1393.

In light of *Brown*, it is apparent that a § 1983 claim of municipal liability based on a hiring or retention decision survives summary judgment only upon evidence from which a jury could reasonably conclude that the final decisionmaker did know or should have known that hiring a particular officer posed an obvious risk of a particular constitutional wrong. The hallmark of *Brown*, and its most significant expansion of, or departure from, prior precedent, is the level of specificity it requires of the trial court in assessing whether there is a jury question that the municipality, acting through its final decision maker, was "deliberately indifferent." *See id.* at 421, 117 S.Ct. 1396 (Souter, J., dissenting). At risk of stating the obvious, the court notes that the viability of Arrington's claim against Rainbow City depends upon the extent to which the evidence distinguishes Alexander's decisions to hire and retain Jenkins from the hiring decision in *Brown* in a way that pushes his claim over the top of *Brown's* exceedingly high practical and theoretical bar to municipal liability. *See Gold v. City of Miami*, 151 F.3d 1346, 1351 n. 10 (11th Cir. 1998)(the standard of proof for deliberate indifference is "intentionally onerous for plaintiffs").

The similarities between this case and *Brown* are straightforward. Both involve municipal liability claims based on a municipality's decision to hire a law enforcement officer who

subsequently used excessive force in violation of the Fourth Amendment.  The distinctions between the two cases, though subtle, are not insignificant, and two in particular must be addressed.

First, unlike the inadequate screening claim in *Brown*, Arrington's claim is not neatly confined to an allegation that the municipality made a single, aberrant decision not to screen an applicant who later injured him.[9]  Construing Arrington's claims liberally, he identifies concurring or alternative official actions that allegedly caused him harm, namely, the decision to hire Jenkins without adequately screening his record and the more general policy of Rainbow City with regard to hiring and leaving on the job those who are accused of wrongdoing.[10]  Arrington challenges the screening, hiring, and supervision policies of Rainbow City, not simply as mis-applied to Jenkins, but both generally and as applied.

A second distinction between this case and *Brown* relates to the specificity of the notice that a more thorough screening of Jenkins' background would have unearthed.  Viewing the evidence in the light most favorable to Arrington, an argument can be made that

---

[9]*See Brown*, *supra* at 408, 117 S.Ct. at 1390 ("Respondent does not claim that she can identify any pattern of injuries linked to...hiring practices. Indeed, respondent does not contend that [the municipality] hiring practices are generally defective.  The only evidence on this point...suggested that Sheriff Moore had adequately screened the backgrounds of all prior deputies he hired. Respondent instead seeks to trace liability to what **can only be described as a deviation from** Sheriff Moore's ordinary hiring practices")(emphasis supplied).

[10]It is not entirely clear which of these Arrington intends to rely on, or if he intends to advance both theories, as his brief simply concludes, using the language from the case law, that he is seeking to impose liability based on the hiring and retention decisions that rose to the level of 'official policy.'

Rainbow City should have known about a very specific risk in hiring Jenkins based on his conduct alleged in the *Daniels* case.   It is true, of course, that at the time Rainbow City hired Jenkins, the excessive force incident in *Daniels* was a mere allegation and had not been proven.   Nonetheless, could a jury conclude from the evidence that the city was indifferent, not to an abstract risk that an un-screened or un-restrained employee might violate some constitutional right, but to a specific risk that Jenkins might use excessive force during an arrest?

Arrington contends that where a municipality specifically declines to look further into known recent allegations of extreme excessive force by a prospective police officer and continues to do nothing while those allegations develop into a § 1983 lawsuit and subsequent judgment against that individual, there is a fact question about whether the city's inaction represents deliberate indifference to the well being of a potential subsequent victim of excessive force by that officer.   The testimony of Alexander and Walton arguably provides a basis for concluding that Rainbow City failed to act on a pending charge that Jenkins, while employed as a Gadsden police officer, had used excessive force and that Rainbow City did not investigate or question Jenkins regarding the charge. Assuming *arguendo* that on this evidence a jury could conclude that Rainbow City was more than merely negligent and instead deliberately disregarded a specific, known constitutional risk, the inquiry does not end there.

14

Arrington's claim fails against Rainbow City, even assuming that Rainbow City was deliberately indifferent to **available information** about Jenkins' past, because there is insufficient evidence to support an inference that the "plainly obvious consequence" of its decisions to hire Jenkins and retain him would be his subsequent use of excessive force. *Brown*, 520 U.S. at 415, 117 S.Ct. at 1393; *see Brooks v. Scheib*, 813 F.2d 1191, 1195 (11th Cir. 1987)(holding that plaintiff was "obligated to produce some evidence...that more effective...procedures would have prevented his injuries").   In light of the standards of culpability and causation applicable to § 1983 municipal liability claims, Arrington can only maintain a claim against Rainbow City by producing evidence that the decisions it made with regard to hiring and retaining Jenkins would not have been made absent deliberate indifference to an "obvious consequence" that he would use excessive force.   *Id.*   Arrington has failed to produce any such evidence.

The only evidence to support the predictability of similar acts by Jenkins are the *Daniels* allegations themselves.[11]  The court takes judicial notice of the fact that most claims of excessive force against a police officer are decided in favor of the officer, whether the claims are frivolous or not.   The court also takes

---

[11] To the extent Arrington relies on the Gadsden police department internal affairs investigations of Jenkins, the court cannot allow an inference of deliberate indifference based on those unsubstantiated allegations, particularly where there is no evidence regarding the subject matter of those investigations. *See Brooks v. Scheib*, 813 F.2d 1191, 1195 (11th Cir. 1987).

judicial notice of the fact that the jury verdict in *Daniels* preceded the incident involving Jenkins and Arrington by only three days. The court has scoured the record to see if Arrington has offered any proof that Rainbow City or Alexander actually knew about the *Daniels* verdict before the Arrington incident.[12] A good argument could be made that a municipality with actual knowledge that one of its police officers has been found by a jury to have used excessive force in making an arrest while earlier employed by another municipality would be obligated to suspend that officer. But when? Three days later or three hours later? The question, of course, involves a consideration of the amount of reaction time the municipality must be allowed before its inaction could be characterized as deliberately indifferent. Here, there is no evidence that Rainbow City was even aware of the *Daniels* verdict before the Arrington incident. Such a crucial fact cannot be left to speculation or conjecture. This leaves the court with only the question of the extent to which Alexander was obligated to investigate Jenkins before hiring him and the extent of the obligation to react to the mere pendency of an excessive force case against Jenkins. Moreover, other undisputed evidence demonstrates that, following the *Daniels* incident in 2000, until Arrington was arrested in 2003, no significant complaint was made regarding

---

[12] Arrington does argue that Rainbow City was "on notice" of the verdict, a proposition with which Rainbow City strangely appears to agree. Nonetheless, Arrington must come forward with evidence that Rainbow City was aware of the verdict, and not merely rely on the verdict being a matter of public record as establishing Rainbow City's obligation to remove Jenkins from duty.

Jenkins' conduct as an officer.  Based on this limited evidence, even if a jury could find Rainbow City guilty of negligence it could not reasonably conclude that Rainbow City caused Arrington to be subjected to the use of excessive force.[13]  *See Brown*, 520 U.S. at 414, 117 S.Ct. at 1393; *Young v. City of Providence*, __ F.3d __, 2005 WL 826073 (1st Cir. April 11, 2005), *20 (holding that procedures involved in reviewing officer's application were not "sufficiently inadequate to raise a jury question" as to the city's "deliberate indifference").

There is no evidence of a pattern and practice by Rainbow City not to properly screen applicants for police officer positions.  If the severe constraints § 1983 places upon municipal liability were not in place, a jury might conclude that Rainbow City and Alexander should have further investigated the allegations that Jenkins had assaulted a young man during an arrest, or that Rainbow City's screening policy was inadequate.  Hindsight is a great teacher. However, a jury's disapproval of the decisions reached by Rainbow City, or of the procedures it used, does not keep Arrington's claim from failing for a lack of evidence from which the jury could infer that Rainbow City was "deliberately indifferent," or in other words, that it could not have hired or retained Jenkins as an officer without having consciously disregarded an obvious risk that he would use excessive force.  To hold otherwise would be to expose

---

[13]Whether the claim is based on the single hiring and retention decisions or the general policies of Rainbow City, this conclusion applies with equal force.

a municipality that employs a "one time" alleged bad actor to liability for his future bad acts, so long as the type of constitutional tort he is subsequently accused of committing is similar to the earlier act.  As interpreted by the Supreme Court, § 1983 does not impose such liability or provide a vehicle for second guessing any but the most clearly callous and indifferent hiring and retention policy decisions made by municipalities. *See Brooks*, 813 F.2d at 1194 (refusing to "mandate a policy which would require that prior complaints always be examined").[14]

Supervisory Liability Claims Against Alexander

Alexander, in his individual capacity, asserts qualified immunity as a defense.  The court agrees that Arrington has failed to establish that Alexander violated clearly established law.  The cases Arrington cites regarding a citizen's right to oppose an unlawful arrest are inapposite.  Simply put, Arrington's right to resist his arrest by Jenkins has nothing to do with establishing that a reasonable person in Alexander's position would have known that hiring and retaining Jenkins infringed upon constitutional rights.  *See Gold v. City of Miami*, 121 F.3d 1442, 1447 (11th Cir. 1997); *McKinney v. DeKalb County, Ga.*, 997 F.2d 1440, 1443 (11th

---

[14] One particularly egregious post-*Brown* case in which the Eleventh Circuit held that there was sufficient evidence to support a jury finding of deliberate indifference illustrates the point. *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1312 (11th Cir. 2001)(upholding jury's conclusion that municipality had policy or custom of ignoring or tolerating gross sexual harassment where commissioners and mayor were well aware of tortfeasor employee's extensive history of sexually inappropriate behavior). Unlike *Griffin*, this is not a case where the allegedly rogue employee's demonstrated propensity for a particular type of misconduct virtually compels the conclusion that he should not have received or retained a particular job.

Cir. 1993).   Defendants' motion is due to be granted as to
Arrington's claim against Alexander in his individual capacity.

Due Process Claims

Arrington has wholly failed to support his purported
procedural and/or substantive due process claims.  Excessive force,
whether a plaintiff characterizes that force as punishment or not,
is prohibited by the Fourth Amendment in relation to arrests.
Arrington has provided no authority for the conclusion that the
injuries he suffered due to Jenkins' alleged use of excessive force
occurred after he had become a pretrial detainee.   The fact that
some of those injuries occurred moments after he was placed in
handcuffs does not logically make him a detainee protected by the
Due Process Clause instead of by the Fourth Amendment.   The due
process claims are therefore duplicative, and defendants' motion
for summary judgment is due to be granted as to them.  *See Ortega
v. Schramm*, 922 F.2d 684, 694 (11th Cir. 1991); *Carr v. Tatangelo*,
338 F.3d 1259, 1267  n. 15 (11th Cir. 2003).

Fifth Amendment Takings and Conversion Claims

Summary judgment is likewise due to be granted as to
Arrington's purported Fifth Amendment takings claim and as to his
conversion claim against Rainbow City and Alexander.  Even if there
was an unlawful taking, Rainbow City is entitled to summary
judgment on the Fifth Amendment claim because Arrington has not
identified an official policy or custom that caused the taking of
the film from and damage to his camera.  Moreover, Arrington has

utterly failed to answer defendants' argument that a single unauthorized wrongful act by a police officer does not give rise to a Fifth amendment takings claim.  He has made no effort to explain how the alleged theft of his film and damage to his camera supports a claim that Jenkins, acting under color of state law, violated the Fifth Amendment injunction that private property shall not "be taken for **public use** without **just compensation.**"  U.S. Const. amend. V (emphasis supplied).  This court declines the invitation to conjure up such a claim for Arrington, and will grant defendants' motion for summary judgment as to the takings claim accordingly.

As for the state law conversion claim against Rainbow City, the law of Alabama provides that a municipality is not liable for the intentional torts of its officers or agents, in this case the officer or officers who allegedly stole the film from and damaged Arrington's camera.  *See Altmayer v. City of Daphne*, 613 So.2d 366, 369 (Ala. 1993); *Scott v. City of Mountain Brook*, 602 So.2d 893, 894-95 (Ala. 1992).  The complaint does not appear to contain a conversion claim against Alexander.  To the extent Arrington attempts to charge Alexander with conversion, the evidence utterly fails to support such a claim.  Material issues of fact prevent the entry of judgment for Jenkins on the conversion claim, but he, like Alexander and Rainbow City, is entitled to summary judgment on the § 1983 takings claim.

<u>Claims Against Jenkins</u>

Genuine issues of material fact exist precluding an entry of summary judgment for Jenkins on the § 1983 excessive force claim, or on the state law claims of assault and battery, false arrest, false imprisonment, malicious prosecution, and conversion. Viewing the facts in the light most favorable to Arrington, the evidence demonstrates that Jenkins physically overtook, battered, and arrested Arrington without a subjectively or objectively reasonable basis for his actions. There is a genuine issue as to whether Jenkins actually thought Arrington's camera was a gun with a laser sight. Jenkins and his fellow officers testify that they believed the camera was a gun, but an equally plausible explanation, also supported by evidence, is that Jenkins and the other officers were angered by Arrington's lawful return to the general area of the search and by his taking pictures, and decided to do something about it. Jenkins cannot be heard to argue that anger alone constitutes a reasonable basis for an arrest or for an accompanying use of force. Jenkins' argument that he is due peace officer immunity under Alabama law is not viable on summary judgment because, based on the evidence, a jury could conclude that Jenkins acted in a way that abrogates such immunity. *See Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000).

*Conclusion*

For the foregoing reasons, the court will grant defendants' motion in part and deny it in part by separate order.

DONE this 19th day of May, 2005.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE